**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

BENJAMIN LEIBELSON,

              Plaintiff,

v.                                    CIVIL ACTION NO.  5:15-cv-12863

MARK COLLINS, et al.,

              Defendants.

**MEMORANDUM OPINION AND ORDER**

This case involves allegations by a former inmate at FCI-Beckley against several staff members. The Defendants have filed individual motions for summary judgment, which the Court will address in a single opinion.

The Court has reviewed the following motions: *Defendant Dr. AnnElizabeth Card's Motion for Summary Judgment on Qualified Immunity* (Document 179)[1] and the supporting memorandum (Document 180), *Defendant Donald Felts' Motion for Summary Judgment on Qualified Immunity* (Document 181) and the supporting memorandum (Document 182), *Defendant Mark Collins' Motion for Summary Judgment on Qualified Immunity* (Document 183) and the supporting memorandum (Document 184), *Defendant Jeremey James' Motion for Summary Judgment on Qualified Immunity* (Document 185) and the supporting memorandum (Document 186), *Defendant Jerry Vance's Motion for Summary Judgment on Qualified Immunity* (Document 187) and the supporting memorandum (Document 188), *Defendant Doug Meyer's*

---

1 The Plaintiff indicates that she does not contest Dr. Card's motion, and so it will be granted as unopposed.

*Motion for Summary Judgment on Qualified Immunity* (Document 189) and the supporting memorandum (Document 190), *Defendant Christopher Cook's Motion for Summary Judgment on Qualified Immunity* (Document 191) and the supporting memorandum (Document 192), *Defendant Jason McMillion's Motion for Summary Judgment on Qualified Immunity* (Document 193) and the supporting memorandum (Document 194), and *Defendant Joshua Taylor's Motion for Summary Judgment on Qualified Immunity* (Document 195) and the supporting memorandum (Document 196).

In addition, the Court has reviewed the *Consolidated Motion of Individual-Capacity Defendants for Summary Judgment on Declining to Extend Bivens Remedy* (Document 197) and the supporting memorandum (Document 198), the *Plaintiff's Memorandum in Opposition to Consolidated Motion of Individual-Capacity Defendants for Summary Judgment on Declining to Extend Bivens Remedy* (Document 210) and the *Plaintiff's Omnibus Memorandum in Opposition to Individual Defendants' Motions for Summary Judgment* (Document 211). The Court has also reviewed each individual Defendant's reply memorandum (Documents 232-240) and the *Reply Memorandum in Support of Consolidated Motion of Individual-Capacity Defendants for Summary Judgment on Declining to Extend Bivens Remedy* (Document 241). Further, the Court has reviewed all attached exhibits, as well as the complete deposition transcripts, which the Plaintiff filed as separate documents. (Documents 213-224.)

For the reasons stated herein, the Court finds that summary judgment should be denied as to the Eighth Amendment claims against Defendants Cook and Meyer, but granted as to all remaining claims.

The Plaintiff, Benjamin "Paris" Leibelson, is a transgender woman who was confined at FCI-Beckley between November 2013 and March 2014.[3]   The Defendants were staff members and supervisory personnel who interacted with Ms. Leibelson at FCI-Beckley.   Ms. Leibelson has a history of drug abuse and petty crime that caused her to spend time in and out of jail as a young adult.   In late 2004, she was arrested for purse snatching in Washington, D.C.   She escaped a halfway house, and was subsequently sentenced for both the original crime and the escape.   Ms. Leibelson spent time in several federal prisons beginning in 2006, with repeated violations of supervised release resulting in new periods of incarceration.   Officials at FCI-Allenwood tacitly encouraged her to form a sexual relationship with another inmate for her own security, and she did so.   She reports that she was sexually assaulted by a different inmate while at FCI-Allenwood. She believes this information was available to officials at FCI-Beckley via prison records. However, an intake form with her signature has a box checked indicating that she was not a victim of sexual assault.

A supervised release violation led to Ms. Leibelson's incarceration at FCI-Beckley in November 2013.   She was openly gay and/or transgender at every prison in which she spent time, with long hair and feminine mannerisms that inmates readily recognized.   Ms. Leibelson spoke with Dr. AnnElizabeth Card, the chief psychologist at FCI-Beckley, on her arrival, and believes she mentioned that she was transgender, though she considers it obvious to any observer.   She

---

2 The following summation of the facts resolves factual disputes and inferences in the light most favorable to the Plaintiff as the non-moving party.   The Defendants vigorously contest the Plaintiff's account of events and deny any wrongdoing or unprofessional behavior.

3 The Court has used female pronouns to refer to Ms. Leibelson throughout, including substituting female for male pronouns used in quotations and statements made by Defendants and witnesses, in an effort to limit confusion.   Some records suggest that Ms. Leibelson presented herself as a homosexual man, rather than a transgender woman, while at FCI-Beckley.

also emailed and spoke with Dr. Card about the possibility of using hormones. It was common knowledge among inmates, and many staff, that Ms. Leibelson was gay and/or transgender. Ms. Leibelson admits that she was not a model inmate, either at FCI-Beckley or at previous institutions. She sometimes used insulting or insolent language with staff, and she broke rules on occasion. She stated that she felt she was more suited to incarceration in a higher security U.S. Penitentiary, rather than the medium-security F.C.I.

Ms. Leibelson met another gay inmate named Jonathan Buell the first day she arrived at FCI-Beckley. He introduced himself and offered her any assistance she might need. Ms. Leibelson asked to be re-assigned to share Mr. Buell's cell, which prison officials approved. Their relationship became romantic after a few days, and they were engaged within two or three months. Although they were aware that sexual relationships between inmates was prohibited by prison rules, Ms. Leibelson and Mr. Buell had an intimate relationship.

Ms. Leibelson's first disciplinary infraction at FCI-Beckley was use of suboxone, for which she was sent to the Special Housing Unit (SHU). She was then released and returned to the cell she shared with Mr. Buell. On February 6, 2014, Defendant Jason McMillion and another correctional officer were in the unit where Ms. Leibelson was housed, conducting the 4:00 p.m. "count," during which all inmates are to stand and make themselves visible to be accounted for by the officers. Ms. Leibelson and Mr. Buell were both in the bottom bunk. A blanket hung from the top bunk to dry obstructed the view into the bottom bunk from the window in the door of the cell. Mr. McMillion called out and kicked the cell door to cause a vibration in case they had headphones in and could not hear. He could see movement through the blanket. Ms. Leibelson and Mr. Buell both deny that they were having sex, and state that they were resting, and Mr. Buell

was assisting Ms. Leibelson with an ingrown hair. Ms. Leibelson stated in her deposition, as well as in various administrative remedy forms, that Mr. McMillion shouted derogatory slurs against homosexuals at her and Mr. Buell. Mr. McMillion reports that Mr. Buell emerged from the bunk first, and Ms. Leibelson followed only after repeated orders. Both appeared disheveled. Because he was concerned that there may have been sexual activity implicating the Prison Rape Elimination Act (PREA), Mr. McMillion called for additional officers in order to separate Mr. Buell and Ms. Leibelson. Ms. Leibelson received an incident report for failing to stand for the count, and was sent to the SHU. She and Mr. Buell maintain that it was unusual to be sent to the SHU for such a minor infraction.

Upon entrance to the SHU, inmates are subject to a visual search, requiring them to remove all clothing, lift their arms and each leg, lift their genitals, and bend over and cough, in order to demonstrate that they have no concealed contraband. Officer Christopher Cook conducted the visual search of Ms. Leibelson on February 6. She passed her clothes through the slot to Officer Cook, and the search began normally. Officer Cook then ordered her to move closer to the gate. When she bent over, he directed her to "open that hole wide." (Leibelson Deposition at 196:6) (Document 213). He then reached his hand through the slot and inserted his finger(s) in her rectum. She objected and moved away quickly. The assault lasted two or three seconds. Ms. Leibelson reports that she felt tearing, and experienced pain afterwards, which had alleviated by the time she was released from the SHU. After Ms. Leibelson pulled away from Officer Cook, he walked away and removed his gloves, then returned and passed her new clothes through the slot. Ms. Leibelson indicated that she did not report the assault immediately because she was

afraid of reprisals. Medical notes indicate that she reported no physical injury when she was examined after she reported the assault about a month later.

Officer Cook was assigned to the SHU during Ms. Leibelson's stay there after the February 6 incident. On February 7, in response to someone asking what she was in the SHU for, he announced that it was for "sucking dick," or words to that effect. (Leibelson Depo. at 217:5.) Around the same time, Officer Cook was delivering razors and cleaning supplies to all inmates in the SHU, but refused to provide them to Ms. Leibelson. Officer Cook told her there were no more razors, although she could see a full box, and he also failed to provide her with cleaning supplies that were available. She indicates that she received hygiene and cleaning supplies on other occasions when they were passed out while she was in the SHU. Officer McMillion worked in the SHU on later occasions when Ms. Leibelson was housed there, and reports that he recalls her refusing to take cleaning supplies on some occasions. Officer Cook stated that he had no recollection of the incident, but would not have denied an inmate cleaning supplies, and would have behaved and spoken professionally. Ms. Leibelson was released from the SHU on or about February 13, 2014, but moved from Oak B Lower to Oak A Upper, in order to separate her from Mr. Buell.

Ms. Leibelson indicated that inmates at FCI-Beckley—and other federal institutions—were divided socially along racial and geographic lines. Because she was from Washington, D.C., she was affiliated with the D.C. inmates, but her transgender status complicated matters. Some D.C. inmates pressured her for sexual favors, and there was an expectation among the D.C. inmates that she would enter into a sexual relationship with another inmate from D.C. Ms. Leibelson initially sat with the D.C. inmates in the cafeteria. However, after she and Mr. Buell established a

relationship, and because of ongoing pressure to offer sexual favors to the D.C. inmates, she and Mr. Buell both sat with a friend of his from Georgia. That caused tension among inmates, particularly after Ms. Leibelson was no longer housed with Mr. Buell, as other inmates viewed her as available. Within the cell block, she dealt with harassment from her new cellmate, who would touch himself in her presence, and from other inmates.

In the cafeteria, an older, long-term inmate ordered Ms. Leibelson not to sit with anyone other than the D.C. inmates because it caused problems among the inmates. She did not believe she could sit with the D.C. inmates without being forced into a sexual relationship with one or more of them. Ms. Leibelson reported the problem to Captain Douglas Meyer and to Warden Collins on multiple occasions, both verbally and in written or emailed requests, followed by submitting administrative complaints, but nothing was done. Ms. Leibelson also spoke with her unit manager, again with no effect. She requested that a table be established in the cafeteria for GBT (gay, bisexual, and transgender) inmates. The request was denied. In his deposition, Capt. Meyer explained that it was a BOP policy, above the institution level, not to segregate inmates in the cafeteria. He denied knowledge that Ms. Leibelson was unable to access food because of threats of sexual abuse by other inmates, and stated that on one occasion when Ms. Leibelson complained of having nowhere to sit in the dining hall, she had a hamburger in her hand.

Other inmates sometimes attempted to smuggle food out of the cafeteria for Ms. Leibelson and Mr. Buell, but that was a violation of prison rules. Inmates were patted down as they left the cafeteria, and if food was found, it was thrown away. On one occasion, Capt. Meyer observed an inmate collecting food for Ms. Leibelson and Mr. Buell, and directed an officer to permit him to leave through a side door to bring them food. He did not offer a more permanent solution,

however.   Ms. Leibelson reports that the longest she went entirely without food at FCI-Beckley was two days.

Ms. Leibelson also continued to experience harassment from some FCI-Beckley employees following her release from the SHU.   She overheard Officer Joshua Taylor and Officer McMillion talking about wanting to be rid of her, after which Officer Taylor conducted a search of her cell, throwing everything on the floor or bed.   In another incident, Ms. Leibelson requested permission to pass Mr. Buell a radio that had been mistakenly placed with her belongings when she and Mr. Buell were sent to the SHU.   Officer Taylor agreed, but then sent them to Lieutenant Felts' office, and may have written them up for sharing property.[4]   When Ms. Leibelson asked why they were being sent to the Lieutenant's office, Officer Taylor said it was "for being gay." (Leibelson Depo. at 292:9.)

Ms. Leibelson and Mr. Buell waited outside Lt. Felts' office for a lengthy period.   When Lieutenant Felts arrived, he screamed at them, called them derogatory and homophobic names, and threatened to send them to a higher-security U.S.P. where they "wouldn't make it three days without the 'blacks' tearing [their] assholes apart."   (Leibelson Depo. at 273:1.)   Ms. Leibelson viewed the statement as a threat, and an indication that Lieutenant Felts did not care about protecting them from sexual assault or harassment because of their sexual orientation.   She also believed that he could have them sent to a higher security facility by writing them up for disciplinary infractions until they reached the number of points necessary to trigger transfer to a

---

4 Officer Taylor describes the incident differently.   He indicates that Ms. Leibelson did not request permission to transfer the property, and he spoke with her and Mr. Buell after observing a close embrace that he viewed as both a rule violation and a potentially dangerous display of their intimate relationship in front of other inmates.   In his account, when Ms. Leibelson responded by accusing him of discrimination, he was unsure of how best to handle the situation, and sent her to the Lieutenant's office.

USP.   Ms. Leibelson was not, in actuality, concerned about the threat of being sent to a USP, because she had spent time in penitentiaries, and prefers them to FCI facilities.

During the time period when Ms. Leibelson and Mr. Buell were housed separately, but in the general population, they met regularly during moves between different areas of the facility, recreation time, and at the chapel.   Officer Jerry Vance was the Religious Resources Assistant, or chapel officer.   Ms. Leibelson and Mr. Buell sometimes watched films in a video room in the chapel.   Ms. Leibelson reports that Officer Vance shut down the video room on February 28, 2014, and someone stated that it was to prevent them from using it.   Ms. Leibelson and Mr. Buell decided to attend a Bible study led by an outside volunteer that was beginning soon after they were sent out of the video room.   Ms. Leibelson testified that she does not identify with any specific religion, but believes in a higher power.   She attended religious services at FCI Beckley in order to spend time with Mr. Buell.   Ms. Leibelson indicates that they behaved respectfully and appropriately during the Bible study, but noticed Officer Vance watching them through the window, and then interrupting the service.[5]   Officer Vance pulled them out of the service, and took them into his office one at a time.   Mr. Buell claims that Officer Vance conducted a pat search that included grabbing his genitals and his buttocks.   Officer Vance then told Ms. Leibelson and Mr. Buell that the chapel was not "a gay church" and that they would not be permitted to come to the chapel while he was working.   (Leibelson Depo. at 288:14.)   Ms. Leibelson did not attempt to go to church services again.

_____

5 Officer Vance asserts that they sat in the back, apart from the group, showed no interest in participating, and were loud and disruptive.   He further stated that he pulled them out and spoke with them in his office one at a time to offer them the option of returning to the Bible study to participate in a non-disruptive manner, or returning to their units, and they chose to return to their units.

After the incident in the chapel, Ms. Leibelson and Mr. Buell decided to report the sexual harassment and abuse they experienced while at FCI-Beckley. Staff members prevented them from speaking to members of a PREA compliance audit team visiting the prison from Washington, D.C., but Ms. Leibelson and Mr. Buell both submitted written administrative remedies, sent to the regional office. They prepared the paperwork in the library at the same time, and may have talked about what happened, but each prepared their own forms. Ms. Leibelson also spoke to Dr. Card on March 11, 2014. When she went to the psychology office, which is in the same building as the chapel, Officer Vance came in and followed her around, until she screamed and refused to be in a room without a camera with him. Dr. Card arrived and brought Ms. Leibelson into an office. Ms. Leibelson recounted Mr. Buell's allegations against Office Vance, as well as her own alleged assault by Officer Cook. She described the continual harassment by Lieutenant Felts and Officers Taylor, McMillion, and Vance. Dr. Card prepared a memorandum for the Warden detailing Ms. Leibelson's allegations, and walked Ms. Leibelson to a Lieutenant's office, where Dr. Card spoke with Captain Meyer, Lieutenant Smith, and Special Investigative Agent (SIA) Anthony Hussion. She also arranged for Ms. Leibelson to be placed in protective custody in the SHU and separated from the officers involved. Mr. Buell reported his sexual assault the same day and was also placed in SHU.

On her entry to the SHU for protective custody, which took place on March 11, 2014, Officer McMillion conducted the visual search. He repeatedly called her a faggot, and, after she had removed her clothing, spit on her nude body. Ms. Leibelson interacted with Mr. McMillion every day while she was in SHU, and he regularly used homophobic slurs. Ms. Leibelson had a cellmate in the SHU, who treated her respectfully and was supportive of her complaints. Mr.

Buell's SHU cell was above hers, and they were able to communicate through the vents in the cells.

Ms. Leibelson reports that Officer Jeremy James, who had previously treated her appropriately, began harassing her during her March placement in the SHU. He made offensive comments about her sexuality and gender identity, including suggesting that he find her a dress. Officer James also threatened to put a piece of metal in her cell if she went to recreation (where she could see Mr. Buell), which she interpreted as a threat to plant a shank in her cell so that she would be disciplined. Lieutenant Felts also did rounds in the SHU, and Ms. Leibelson states that he used homophobic slurs toward her.

Mr. Buell was moved to prevent continued communication through the vents. Ms. Leibelson explains that she was very upset by this because they remained under the control and supervision of the officers who had harassed them, but were unable to check on one another's safety. On March 22, 2014, she responded by covering the window of the cell and repeatedly breaking the sprinklers, flooding the cell. Officer McMillion initially responded by ordering Ms. Leibelson and her cellmate to remove the window covering and submit to hand restraints, but they refused. Ms. Leibelson admits that she used profane language and threatened staff with lawsuits and/or complaints that could result in negative employment consequences.[6] Lieutenant Felts responded, and directed Ms. Leibelson and her cellmate to uncover the window and submit to hand restraints, which they again refused. Lieutenant Felts notified Captain Meyer and obtained approval for a calculated use of force. He used a pole with extensions on the sides to push the

---

6 Officer McMillion prepared a memorandum to the Warden claiming that he heard Ms. Leibelson encouraging her cell mate to make false allegations against staff and admitting to another inmate that her own allegations were untrue. Ms. Leibelson denies making any such statements.

barricade away, which Ms. Leibelson says struck her in the hip. She and her cellmate then submitted to hand restraints without further use of force, and were removed from the cell and taken to the visual search room.

Lieutenant Felts claims that his involvement in the incident ended at that point. Ms. Leibelson, however, claims that he threatened her with what appeared to be a shotgun when she attempted to break the sprinkler in the visual search room. He pointed the gun at her and said, "I'm going to shoot you in your pussy." (Leibelson Depo. at 358:12.) Officers do not carry lethal weapons on the compound at FCI-Beckley. Ms. Leibelson is not familiar with firearms and does not know what type of gun it was, but noted that it had a pump. When asked if corrections officers carry guns in FCIs, she replied, "No, but he was." (Leibelson Depo. at 360:15.) Ms. Leibelson stopped attempting to break the sprinkler, and the officers put her in ambulatory restraints and brought her to another cell. While she was in the open area accessible to all cells, she shouted to Mr. Buell, telling him she had been breaking the sprinklers and asking if he was all right.

Ms. Leibelson remained in restraints for 24 hours, which triggered a visit by Dr. Card on March 23, 2014. During that visit, Ms. Leibelson made detailed allegations against Officers Cook James, McMillion, Taylor, Vance, and Lieutenant Felts, for past sexual misconduct or harassment, continued harassment, and retaliation for the previously filed complaints. Dr. Card prepared another memorandum for Warden Collins, dated March 25, 2014. Upon review of that memorandum, Warden Collins initiated efforts to transfer Ms. Leibelson. Mr. Hussion was also in contact with officials regarding a transfer. The transfer was quickly approved.

On March 26, 2014, Mr. Hussion met with Ms. Leibelson to try to calm her down. He explained that when inmates with complaints were acting out, he would sometimes be asked to speak with them. Mr. Hussion was in the process of conducting an investigation regarding Ms. Leibelson's allegations against staff members, but he did not initially intend to interview Ms. Leibelson on that subject on March 26. He assured her that he was looking into the allegations, but when she wanted to talk about that subject, he stopped her. He did not have a computer to type the details or draft an affidavit for her to sign, so he asked her to do the interview later. Ms. Leibelson also talked about wanting a transfer during the first conversation with Mr. Hussion, and the transfer was approved shortly thereafter. When Mr. Hussion had the interview set up, Ms. Leibelson refused to speak with him. She indicated in her deposition that she did not believe he would be impartial because he worked for the BOP. At the time, Mr. Hussion recalls her saying that she had gotten what she wanted because she was going to be transferred. He made no further attempts to obtain a statement from Ms. Leibelson detailing her recollection of staff misconduct, either before or after her transfer. Mr. Hussion spoke with the staff members against whom allegations had been made, with a particular focus on the most serious allegations against Officer Cook. Because Ms. Leibelson declined to speak with him, he had no facts to counter Officer Cook's denial, and concluded that the sexual misconduct allegations were not sustained.

Ms. Leibelson was transferred to FCI-McDowell on March 28, 2014. Mr. Buell was transferred shortly thereafter. While at FCI-McDowell, Ms. Leibelson re-submitted her administrative remedies from FCI-Beckley because she was concerned that they had not been properly reviewed or processed. She was housed in the SHU at FCI-McDowell without a cell mate for the entirety of her time there, and had no disciplinary issues. Ms. Leibelson spent much

of her time documenting her account of her experiences at FCI-Beckley in preparation of this lawsuit. After Ms. Leibelson's transfer, Mr. Hussion continued his investigation into her allegations at FCI-Beckley, interviewing the accused staff members. He prepared affidavits summarizing their sworn statements, all of which denied wrongdoing, which each staff member reviewed and signed. Ultimately, Mr. Hussion found each allegation to be unsustained.

Ms. Leibelson is currently being treated for post-traumatic stress disorder, general anxiety, panic attacks, and she is on an anti-depressant. She fractured her spine in a fall, and takes opioid pain medication. She has been working with her doctor to reduce her dosage, and she sees a masseuse to assist with pain relief without opioids. Ms. Leibelson's treatment for mental health conditions extends to her early childhood, but she reports that her depression, PTSD, anxiety and panic attacks have significantly worsened as a result of her experiences at FCI-Beckley. She admits that she claimed she had anxiety in order to obtain Xanax and Klonopin without a real medical need prior to her incarceration at FCI-Beckley, but has since experienced ongoing anxiety and frequent panic attacks. On February 18, 2015, Ms. Leibelson, along with her parents, signed a document prepared by a psychiatrist detailing the circumstances and history of her various diagnoses. It includes a brief discussion of abuse suffered in prison, but mentioned only physical and sexual abuse by other inmates. Ms. Leibelson indicated during her deposition that she generally avoids discussing the abuse by staff at FCI-Beckley due to this ongoing litigation.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar.

31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## APPLICABLE LAW

*Bivens v. Six Unknown Federal Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) provides a legal framework for alleging constitutional violations against federal officials. Ms. Leibelson asserts violations of her First Amendment right to free exercise of religion, her Fifth Amendment right to due process and equal protection, and her Eighth Amendment right to be free of cruel and unusual punishment.

### A. *Ziglar v. Abbasi*

The Supreme Court recently clarified the analysis courts should perform when addressing *Bivens* claims in *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017). That case involved claims by non-citizens detained pre-trial in the United States during the course of the investigation into the September 11, 2011 terrorist attacks, who had since been released and removed from the United States. The plaintiffs brought claims against top officials in the Executive Branch, including the attorney general, the head of the FBI, and the Immigration and Naturalization Service Commissioner, and against the warden and associate warden at the detention center. They alleged violations of both the due process and the equal protection components of the Fifth Amendment

16

based on the harsh conditions of confinement, abuse by guards, and mistreatment based on race, religion, or national origin, and unjustified strip searches in violation of the Fourth Amendment.

The Supreme Court cautioned courts against engaging too readily in the "disfavored" judicial activity of expanding the *Bivens* remedy absent Congressional direction. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1857 (2017). The Court set forth the following "test for determining whether a case presents a new *Bivens* context:"

> If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859–60. Where a case does present a new context, the *Bivens* remedy should not be expanded "if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Id.* at 1857 (citing *Carlson v. Green*, 446 U.S. 14, 18 (1980) and *Bivens*, 403 U.S. at 397). The special-factors "inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58.

### B. First Amendment & Religious Freedom

Prison inmates retain their First Amendment right to religious freedom, though that right may be constrained by the practical realities and security needs of the institution. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). The Religious Freedom Restoration Act (RFRA) further

strengthened protections for religious liberty. *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015). "[A] prisoner's request for accommodation must be sincerely based on a religious belief and not some other motivation." *Id*. at 862. After it has been established that the inmate is motivated by a sincere religious belief, courts consider whether the prison's policy or action "substantially burdens his religious exercise." *Id*. Many religious freedom cases brought by current inmates seek injunctive relief; the Plaintiff herein is no longer incarcerated and seeks monetary damages. As the Court noted in addressing the Defendants' motion to dismiss, it is not clear that *Bivens* may be extended to First Amendment claims. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (noting reluctance to extend remedy); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68–69, (2001); *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 51 (D.D.C. 2013) (recognizing binding D.C. Circuit precedent permitting *Bivens* actions for First Amendment free speech and assembly violations); *Turkmen v. Hasty*, 789 F.3d 218, 236 (2d Cir. 2015) (declining to extend *Bivens* to a free exercise claim).

### C. Fifth Amendment

A Fifth Amendment equal protection claim requires that a plaintiff "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. If he makes this showing, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Veney v. Wyche*, 293 F.3d 726, 730–31 (4th Cir. 2002) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). "When equal protection challenges arise in a prison context…courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner." *Id*. at

732. Even so, courts should remain cognizant of "the concerns that justify application of a heightened standard outside of the prison context." *Id.* Verbal abuse, even verbal abuse directly related to membership in a protected class, is generally not sufficient to state an equal protection claim within the prison context. *Chappell v. Miles*, No. CA 2:12-303-MBS, 2012 WL 1570020, at *2 (D.S.C. May 3, 2012) ("Verbal abuse, although unprofessional and reprehensible, is insufficient to establish a constitutional deprivation."). However, although use of derogatory language does not state an *independent* claim, it can provide evidence of animus for purposes of an equal protection claim. *DeWalt v. Carter*, 224 F.3d 607, 612, fn 3 (7th Cir. 2000).

### D. Eighth Amendment

The standard for Eighth Amendment claims involving excessive force recognizes that use of force is sometimes necessary to maintain order in the prison context. The United States Supreme Court held in 1992 that the "core inquiry" in excessive force cases is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). It specified that the bar on cruel and unusual punishment "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9–10 (internal quotation marks omitted). The Supreme Court has explained that its decision in *Hudson* did not set an injury threshold for excessive force claims, but instead "shift[ed] the core judicial inquiry from the extent of the injury to the nature of the force— specifically, whether it was nontrivial and was applied maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (per curiam) (internal quotation marks and punctuation

omitted).   The Fourth Circuit has since held that, in light of *Wilkins*, "there is no *de minimis* injury threshold for an excessive force claim."   *Hill v. Crum*, 727 F.3d 312, 316 (4th Cir. 2013).

Sexual assault, whether committed by guards or inmates, can constitute an Eighth Amendment violation compensable under 42 U.S.C. § 1983.   *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825 (1994); *Makdessi v. Fields*, 789 F.3d 126 (4th Cir. 2015); *Oxendine-Bey v. Harihan*, No. 5:12-CT-03084-FL, 2015 WL 5331809, at *5 (E.D.N.C. July 22, 2015), *report and recommendation adopted*, No. 5:12-CT-3084-FL, 2015 WL 5330571 (E.D.N.C. Sept. 14, 2015); *Ball v. Bailey*, No. 7:15CV00003, 2015 WL 4591410, at *8 (W.D. Va. July 29, 2015) (collecting cases involving sexual abuse/assault claims in the prison context).

In addition to prohibiting excessive force against prison inmates, the Eighth Amendment requires that prison officials "provide humane conditions of confinement."   *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).   In considering whether practices and procedures in prisons constitute "punishment" for Eighth Amendment purposes, courts are to consider "whether they are rationally related to a legitimate non-punitive governmental purpose and whether they appear excessive in relation to that purpose."   *Bell v. Wolfish*, 441 U.S. 520, 561 (1979).   A prison official can be found to have violated the Eighth Amendment only if "the deprivation alleged [is], objectively, sufficiently serious" and the official had a "sufficiently culpable state of mind."   *Farmer*, 511 U.S. at 834 (internal quotation marks and citations omitted).   The 'sufficiently culpable state of mind' applicable to cases asserting unconstitutional conditions of confinement is deliberate indifference. *Id.*   Deliberate indifference requires a showing "that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."   *Id.* at 842.

### E.   Qualified Immunity

The Defendants each assert a defense of qualified immunity.   Qualified immunity is an affirmative defense intended to shield public officials from civil suits arising out of their performance of job-related duties.   *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). Defendants asserting a qualified immunity defense first bear the burden of "demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties."   *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997) (internal quotation marks omitted.)   The defense of qualified immunity is available unless the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff…."   *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (internal emphases omitted). Officials are protected even if they make reasonable mistakes of fact or law, so long as they do not violate a clearly established statutory or constitutional right.   *Pearson*, 555 U.S. at 231–32.   "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."   *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (internal quotation marks and citations omitted).   Courts are advised to "ask first whether a constitutional violation occurred and second whether the right violated was clearly established."[7]   *Id.*

### DISCUSSION

The Defendants each argue that they are entitled to qualified immunity, that the Plaintiff's claims are not supported by sufficient evidence to survive summary judgment, and that her civil

---

[7] "Courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"   *Smith v. Ray*, 781 F.3d 95, 106, fn 3 (4th Cir. 2015) (citing *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)).

conspiracy claim is not legally viable. The Court will first address the conspiracy claims and the motion regarding *Ziglar*, and then address the remaining individual claims.

### A. Conspiracy

The Defendants each contend that the Plaintiff's conspiracy claims are not supported by the evidence, and would not be legally viable even if there were evidence of a conspiracy. They assert that there is no evidence that they acted in concert or that each Defendant was aware of the actions of, and allegations against, the other Defendants. Ms. Leibelson does not appear to argue that her conspiracy claims should be permitted to proceed.

A conspiracy claim under either the common law or 42 U.S.C. § 1985(3) requires a showing that the conspirators acted jointly to deprive the Plaintiff of a constitutional right or of equal protection under the laws. Ms. Leibelson has not produced evidence that the Defendants acted in concert, or even that the officer level Defendants were aware of Ms. Leibelson's complaints. Accordingly, summary judgment must be granted to the extent liability against any Defendant is premised on a legal theory of conspiracy.

### B. Bivens Expansion

The Defendants filed an additional motion for summary judgment arguing that the Court should decline any expansion of the *Bivens* remedy under the "special factors" analysis set forth in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). The Plaintiff argued that her Fifth Amendment equal protection claims and Eighth Amendment sexual abuse and conditions of confinement claims do not require expansion of the *Bivens* remedy, and that no special factors support hesitation with respect to her First Amendment claim.

The Court finds that Ms. Leibelson's equal protection claims present a *Bivens* claim in a context that is materially different from that in the Supreme Court's previous *Bivens* cases, none of which involved Fifth Amendment equal protection claims brought by a federal prison inmate.[8] Having closely examined Ms. Leibelson's equal protection claims, and supporting evidence, the Court concludes that expansion of the *Bivens* remedy is not appropriate under the circumstances presented in this case.

Ms. Leibelson's equal protection claims, briefly summarized, are as follows: Officer Cook, motivated by anti-LGBT animus, sexually assaulted her and refused to provide her with hygiene and cleaning supplies. Lieutenant Felts threatened to send her to a Penitentiary and threatened to shoot her with a weapon classified as non-lethal. Officer McMillion spit on her nude body during a visual search while calling her derogatory slurs based on her LGBT status. Mr. Vance removed her from a Bible study class and told her not to return to the chapel because "this is not a gay church." (Leibelson Tr. at 288:14.) Captain Meyer did nothing when Ms. Leibelson complained of being unable to eat in the dining hall due to the threat of sexual abuse by other inmates. Officer James joked about finding Ms. Leibelson women's clothing and threatened to plant a shank in her cell. Officer Taylor sent Ms. Leibelson to the Lieutenant's office for discipline because of her sexual orientation, and interfered when she and Mr. Buell embraced but permitted heterosexual inmates to hug. Warden Collins delayed transferring Ms. Leibelson despite her allegations against staff members, leaving her subject to additional abuse.

Ms. Leibelson's claims involve specific actions by individual officers—the type of claim for which *Bivens* relief has traditionally been available. The actions involved, though, are less

---

[8] To the extent the Eighth Amendment claims present a new context, the Court will address the *Ziglar* factors within the discussion of each Defendant's motion.

well suited to damages claims against the individual officers.   Damages arising from being denied cleaning supplies on one instance, or being barred from attending chapel services and events, or not being permitted to hug a significant other, would be difficult to quantify and to correlate to the specific violations.   Furthermore, there is not a great deal of case law in lower courts addressing a *Bivens* damages remedy for equal protection claims in federal prisons.   That requires additional caution in extending a direct damages remedy due to the limited "judicial guidance as to how an officer should respond to the problem or emergency to be confronted."   *Ziglar*, 1843 S.Ct. at 1860. Ms. Leibelson asserts that this case is like *Bivens* in that no remedy is available if she is not permitted to seek a damages remedy.   However, Ms. Leibelson is actively pursuing a Federal Tort Claims Act case with overlapping allegations.   In addition, equal protection claims in federal prisons are often presented as habeas claims seeking injunctive relief.   Ms. Leibelson has been released, but that avenue may have been available to her had she chosen to pursue it while she was incarcerated.   Accordingly, the Court finds that the Defendants' motions for summary judgment should be granted as to Counts Two and Three.

### C.  Donald Felts

Lieutenant Felts argues that he is entitled to qualified immunity and summary judgment with respect to the allegation that he pointed a gun at Ms. Leibelson and threatened to shoot her because "it was a reasonable response to Plaintiff's admitted ongoing destructive behavior and clear violations of prison rules."   (Felts' Mem. at 1) (Document 182.)   He further argues that his alleged threat to have Ms. Leibelson transferred to a Penitentiary cannot constitute a violation because he lacked the power to carry it out, and because Ms. Leibelson admitted that she preferred incarceration in a higher-security Penitentiary.   Ms. Leibelson argues that Lieutenant Felts called

her derogatory names, pointed a pepper ball gun[9] at her, and threatened to shoot her, putting her in imminent fear of injury or death. She argues that she has produced sufficient evidence to support an Eighth Amendment claim against Lieutenant Felts.

Ms. Leibelson has produced evidence[10] that Lieutenant Felts expressed anti-homosexual views by calling her and Mr. Buell derogatory names on multiple occasions. In one instance, he called them faggots, queers, and other names, and threatened to have them transferred to a higher-security institution after they were sent to his office for hugging and exchanging headphones. In a later incident, Lieutenant Felts responded to the SHU when Ms. Leibelson was destroying sprinkler heads. After she had been removed from her cell and placed in the visual search room, she attempted to break the sprinkler head in that room. She claims that Lieutenant Felts obtained a shotgun (perhaps a pepperball gun classified by the BOP as non-lethal), pointed it at her, and threated to "shoot her in the pussy."

The Court finds it appropriate in this case to address whether a reasonable officer would have been aware that the conduct was a constitutional violation, rather than first determining whether threatening an inmate with a non-lethal firearm to prevent property destruction constitutes a violation of the Eighth Amendment. Ms. Leibelson has not pointed to case law holding that threatening an inmate who is destroying property or causing a disturbance with a weapon classified as non-lethal constitutes an Eighth Amendment violation. The Court must view the facts and all reasonable inferences to be drawn therefrom in the light most favorable to Ms. Leibelson, but those

---

9 Although Ms. Leibelson stated that she did not know what type of gun Lieutenant Felts had, and Lieutenant Felts claims that he did not have any type of gun, she appears to have now concluded that the weapon was a pepper ball gun.

10 The Defendants suggest that the Plaintiff's own account of events, without corroboration, is insufficient evidence to defeat summary judgment. Credibility determinations are for the jury, and the Court must resolve factual disputes in favor of the Plaintiff at this stage. Her deposition testimony is, of course, valid evidence for consideration in evaluating a motion for summary judgment.

facts are considered from the officer's perspective. *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).   Lieutenant Felts was called to the SHU with approval to use limited force to remove Ms. Leibelson and her cellmate from their cell preventing her from continuing to break sprinkler heads and flooding the unit.   Ms. Leibelson testified that she believed the weapon Lieutenant Felts brandished at her was a loaded, lethal shotgun—but Lieutenant Felts was aware that no lethal firearms were permitted on the compound, and any weapon he had was classified as non-lethal. Given the lack of clear precedent addressing similar factual scenarios, the Court finds that a reasonable officer would not have been aware that threatening a disruptive inmate with a non-lethal weapon was a clearly established constitutional violation.   Accordingly, Lieutenant Felts is entitled to qualified immunity, and his motion for summary judgment must be granted.

### D. Religious Services Assistant Jerry Vance

Mr. Vance argues that he is entitled to summary judgment as to Ms. Leibelson's claims that he violated her right to free religious exercise and equal protection.   He argues Ms. Leibelson's admission that she and Mr. Buell attended chapel to spend time together and were not affiliated with any organized religion defeats her First Amendment and RFRA claims.   Mr. Vance further asserts that Ms. Leibelson cannot demonstrate that he removed her from the church because of her sexual orientation or gender identity.   He argues that the "plaintiff is required to produce more than her own unsubstantiated allegations" regarding his motives.   Ms. Leibelson argues that Mr. Vance admitted in his deposition that he has religious objections to homosexuality and that he believed Ms. Leibelson and Mr. Buell were a couple.   She further argues that her testimony that she believes in a higher power establishes that Mr. Vance's actions interfered with her ability to practice sincerely held religious beliefs.

Ms. Leibelson has not produced evidence that would permit a jury to find that she was attending the chapel in furtherance of sincerely held religious beliefs. Both she and Mr. Buell stated that they began going to the chapel after they were separated in order to spend time together. She does not recall the denomination of the services they attended, and she admitted that she does not identify with any particular religion. Therefore, the Court finds that Mr. Vance's motion for summary judgment must be granted as to Count V.[11]

### E.  Captain Douglas Meyer

Captain Meyer argues that he is entitled to summary judgment because he was not personally involved in any violation of her rights. Although Ms. Leibelson complained to him of her inability to access food in the dining hall, he argues that he had no obligation to honor her request for a special GBT table. He further argues that there is no evidence that he engaged in any discriminatory action. Ms. Leibelson clarifies that she "is asserting a single equal protection claim against Defendant Meyer: namely, that he refused to arrange for her to sit and eat at the prison chow hall without risk of assault by another inmate because of her transgender status." (Pl.'s Omnibus Resp. at 41-42) (Document 211.) She argues that Captain Meyer relies on disputed facts to support his argument that he was unaware that other inmates demanded sexual favors in return for permitting her to sit in the dining hall.

Ms. Leibelson's claims against Captain Meyer present a new *Bivens* context under the standard set forth in *Ziglar v. Abbasi*, although the claims are quite analogous to the claims of deliberate indifference to a prison inmate's medical condition in *Carlson v. Green*, 446 U.S. 14 (1980). Deliberate indifference claims, like other claims brought pursuant to the Eighth

---

[11] Because the evidence is not sufficient to support a religious freedom claim, it is unnecessary to consider whether it would be appropriate to expand the *Bivens* remedy to such a claim.

Amendment, are frequently litigated and well-suited to judicial resolution. In this case, the Plaintiff brings a claim against an individual officer to whom she complained of her inability to access food in the dining hall without risking sexual abuse by other inmates.[12] This case does not implicate national security, prison policy, or other executive or legislative functions. In short, no special factors cause the Court any hesitation in permitting a *Bivens* case to proceed on this claim.

Ms. Leibelson testified that she spoke with Captain Meyer on multiple occasions about not having a safe place to sit in the dining hall, including informing him that there was nowhere for gay or transgender inmates to sit without "having to submit to doing things that we don't want to do." (Leibelson Depo. at 259:19.) She also sent emails and submitted administrative grievances requesting a GBT table because of "fear of verbal or physical abuse" from other inmates and the "risk[ of] being assaulted." (Pl.'s Administrative Remedy Forms, March 6, 2014 & February 26, 2014, att'd as Meyer's Ex. 5, Document 189-4). The Eighth Amendment requires prison officials to provide humane conditions of confinement, including ensuring "that inmates receive adequate food, clothing, shelter and medical care," and protecting inmates from violence by other prisoners.[13] *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). "[T]o make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious

_____

12 Ms. Leibelson argues that Captain Meyer should have approved her request for a separate dining table for GBT inmates. Courts cannot properly prescribe policy in federal prisons, and the method of resolving Ms. Leibelson's complaints remains wholly in the control of prison officials. The evidence suggests that Captain Meyer lacked the authority to establish such a table, in any event. He could, however, have taken other actions to eliminate the threat or to ensure that Ms. Leibelson received meals.

13 Captain Meyer argues that Ms. Leibelson conceded her Eighth Amendment claim because she does not address it in her response. Although Ms. Leibelson focuses her legal argument on equal protection, her evidence against Captain Meyer (and her deliberate indifference arguments) fit within the Eighth Amendment deliberate indifference framework. Captain Meyer has not shown that he is entitled to summary judgment on the allegation that he did not appropriately respond to Ms. Leibelson's complaints about her inability to eat in the dining hall without being subject to sexual abuse because that claim is legally viable under well-established Eighth Amendment precedent. The Court independently evaluates the legal viability of claims to resolve a motion for summary judgment, and a party's reliance on misguided or unhelpful legal arguments is not dispositive.

deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.'" *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016) (quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)).   A jury could find that Captain Meyer failed to act despite knowing that Ms. Leibelson would either go hungry or face sexual abuse from her fellow inmates.   The case law regarding deliberate indifference to inhumane conditions was well-established at the time Captain Meyer allegedly failed to address Ms. Leibelson's inability to eat in the dining hall, and he is thus not entitled to qualified immunity.   Accordingly, the Court finds that Captain Meyer's motion for summary judgment must be denied as to Count One.

### F.  Christopher Cook

Officer Cook argues that he is entitled to qualified immunity and summary judgment because Ms. Leibelson's claim that he inserted his finger(s) into her rectum during a strip search is uncorroborated and implausible.   He points to declarations of prison psychologists, stating that Ms. Leibelson's initial reports contained slightly different details of the alleged sexual assault than her deposition testimony, and that one psychologist recalled her saying that an Officer Williams, rather than Officer Cook, told her that she was in the SHU for "sucking dick."   (Cook Mem. at 10) (Document 192).   Ms. Leibelson's treating psychologists outside of prison likewise offered somewhat inconsistent accounts of Ms. Leibelson's description of sexual abuse at FCI-Beckley, with one noting reports of sexual abuse by inmates, and another recounting Ms. Leibelson describing being raped by prison guards at FCI-Beckley.   Officer Cook further argues that reaching through the tray slot would have posed a risk to his own safety, and is therefore not a credible allegation.   Ms. Leibelson contends that she has produced sufficient evidence of the sexual assault for her Eighth Amendment claim to proceed, emphasizing the factual disputes

between the parties.   She argues that the cited inconsistencies in her descriptions of the sexual assault are minor, and that such inconsistencies are common in victims of sexual abuse.

The Court notes, as an initial matter, that most of the "inconsistencies" in Ms. Leibelson's account of the alleged sexual assault are inconsistencies between Ms. Leibelson's direct statements and administrative remedy forms, and the descriptions of her statements recounted by others. Unlike cases in which courts disregard a litigant's inconsistent statements, Ms. Leibelson has not submitted an affidavit or testimony denying digital penetration by Officer Cook, and there is no evidence that she ever denied that Officer Cook sexually assaulted her.   Ms. Leibelson's credibility is a question for the fact-finder.   Her deposition testimony, as well as the administrative remedies she signed and the reports made to Dr. Card, constitute evidence of the alleged sexual assault.   A reasonable juror, resolving factual disputes and credibility determinations in Ms. Leibelson's favor, could find that Officer Cook violated her right to be free of cruel and unusual punishment by sexually assaulting her.   It is well-established that sexual assault constitutes an Eighth Amendment violation, and Officer Cook does not contend that any legitimate penological purpose justified inserting a finger into Ms. Leibelson's rectum, instead arguing only that he did not do so.   Therefore, the Court finds that Officer Cook is not entitled to qualified immunity. Officer Cook's motion for summary judgment as to Count One must be denied.

### G.  Jason McMillion

Officer McMillion disputes Ms. Leibelson's account of his actions and denies calling her names or spitting on her.   He further argues that he is entitled to summary judgment because none of the accusations against him establish a constitutional violation.   Ms. Leibelson contends that Officer McMillion called her a faggot on multiple occasions.   She characterizes the incident in

30

which he called her derogatory names and spit on her nude body during a visual search as a sexual assault and battery. She argues that this incident supports her Eighth Amendment claim.

In the opinion on the motion to dismiss, the Court noted that, taken in isolation, "verbal insults and a single incidence of spitting do not state an Eighth Amendment claim." (Mem. Op. and Order at 12) (Document 66) (citing *Owens v. SCDC*, No. CIVA 8:09-278-GRA, 2009 WL 4807005, at *5 (D.S.C. Dec. 8, 2009); *Edwards v. Bayside State Prison*, No. CIV.A. 13-0833 NLH, 2014 WL 6991463, at *6 (D.N.J. Dec. 10, 2014) (collecting cases)). The Court has found that Ms. Leibelson has not produced sufficient evidence to permit a jury to find a conspiracy. Because spitting and verbal abuse, though reprehensible, do not rise to the level of a constitutional violation, the factual dispute about whether Officer McMillion spit on Ms. Leibelson and used slurs related to her sexuality is not material. Accordingly, Officer McMillion's motion for summary judgment must be granted as to each count.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Consolidated Motion of Individual-Capacity Defendants for Summary Judgment on Declining to Extend Bivens Remedy* (Document 197) be **GRANTED** as to Counts Two and Three, and **DENIED** as to the remaining counts. The Court further **ORDERS** that *Defendant Dr. AnnElizabeth Card's Motion for Summary Judgment on Qualified Immunity* (Document 179) be **GRANTED** as unopposed, that *Defendant Donald Felts' Motion for Summary Judgment on Qualified Immunity* (Document 181) be **GRANTED** as to Count One, that *Defendant Mark Collins' Motion for Summary Judgment on Qualified Immunity* (Document 183) be **GRANTED**, that *Defendant Jeremey James' Motion for Summary Judgment on Qualified Immunity* (Document

185) be **GRANTED**, that *Defendant Jerry Vance's Motion for Summary Judgment on Qualified Immunity* (Document 187) be **GRANTED**, that *Defendant Doug Meyer's Motion for Summary Judgment on Qualified Immunity* (Document 189) be **DENIED** as to Count One, that *Defendant Christopher Cook's Motion for Summary Judgment on Qualified Immunity* (Document 191) be **DENIED** as to Count One, that *Defendant Jason McMillion's Motion for Summary Judgment on Qualified Immunity* (Document 193) be **GRANTED**, and that *Defendant Joshua Taylor's Motion for Summary Judgment on Qualified Immunity* (Document 195) be **GRANTED.**

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER:    December 27, 2017

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA